729 S.E.2d 179

**LAWYER DISCIPLINARY BOARD, Petitioner**

**v.**

**Michael S. SANTA BARBARA, a member of the West Virginia State Bar, Respondent.**

**No. 10–4011.**

Supreme Court of Appeals of West Virginia.

Submitted April 10, 2012.

Decided June 7, 2012.

Andrea J. Hinerman, Office of Disciplinary Counsel Charleston, WV, for Petitioner.

Robert H. Davis, Jr., Harrisburg, PA, for Respondent.

PER CURIAM:

This lawyer disciplinary proceeding brought against Michael S. Santa Barbara (hereinafter "Mr. Santa Barbara") originated in a Statement of Charges issued against Mr. Santa Barbara by an investigative panel of the Lawyer Disciplinary Board (hereinafter

"Board").[1] The Statement of Charges was filed with this Court by the Office of Disciplinary Counsel (hereinafter "ODC") on December 9, 2010. Following an evidentiary hearing on May 4 and 5, 2011, a Hearing Panel Subcommittee (hereinafter "HPS") of the Board found that the proof presented in support of the charges reflected violations of several provisions of the West Virginia Rules of Professional Conduct.[2] Based upon these violations, the HPS proposed in its November 20, 2011, Recommended Decision that Mr. Santa Barbara be sanctioned, which sanctions included a one year suspension of his license to practice law.

Mr. Santa Barbara summarized his objection to the "unduly severe sanction of suspension from [the] practice of law" as being inconsistent with the findings of facts of the HPS and as not supported by the record. Mr. Santa Barbara maintains that the HPS failed to give appropriate weight to the mitigating circumstance of the significant depression he was experiencing during the time span covering the complaints, particularly in light of the evidence of the disruptive actions of an office staff member who was eventually fired. He further maintains that the HPS failed to recognize that the havoc created by the former employee at the law office affected Mr. Santa Barbara's ability to defend the disciplinary charges. Additionally, Mr. Santa Barbara contends that HPS was incorrect in considering his failure to admit he represented one of the complainants to be an aggravating factor when there was inadequate proof of representation.

For the reasons discussed below, we accept the recommendations and conclusions of law presented by the Board along with the sanctions the Board has recommended. These sanctions are: (1) suspension from the practice of law for a period of one year; (2)

participation in psychological and/or psychiatric counseling during the suspension and until such time that it is determined by the treating psychologist or psychiatrist that treatment is no longer necessary, with reports regarding the same submitted to ODC every six months; (3) completion of eight hours of continuing legal education in office management and office practice within the next twenty-four months with satisfactory proof of completion provided to the ODC; (4) supervised practice for one year upon reinstatement; and (5) reimbursement to the Board for costs incurred in this proceeding.

## I. Factual Background

Mr. Santa Barbara was first admitted to the West Virginia State Bar on January 15, 1991. Before opening the Law Office of Michael Santa Barbara in the latter part of the 1990's, Mr. Santa Barbara practiced with various firms in the Martinsburg, West Virginia area. As of January 1, 2003, he entered into practice with is wife, Kathy Santa Barbara (hereinafter "Mrs. Santa Barbara"), forming the new firm of Santa Barbara Law Offices. Mr. Santa Barbara brought his legal assistant/secretary into the newly formed practice. Likewise, Mrs. Santa Barbara brought at least one of her assistants from her prior legal practice to the new firm. Penny Young was one of the people Mrs. Santa Barbara brought to the joint practice and whose questionable behavior and actions were referenced throughout the disciplinary proceeding.[3]

On November 3, 2010, a four count Statement of Charges was issued against Mr. Santa Barbara. The charges arose from a total of four complaints, three filed against him by former clients and one filed by the ODC. The following is a summary of the facts surrounding each of the four counts.

---

1. Although having no bearing on the decision reached herein, the Office of Disciplinary Counsel filed with this Court a subsequent disciplinary petition involving Mr. Santa Barbara on May 16, 2012.

2. Reference in this opinion to particular rules of the West Virginia Rules of Professional Conduct will be by simple citation to "Rule ____."

3. It is noted in the Board's brief that Ms. Young and one of the complainants, Mr. Sencindiver, were friends and that she had advised Mr. Sencindiver to contact the ODC to file a complaint. Mrs. Santa Barbara testified that in August 2008 Ms. Young was fired for office-related misconduct. The Board's brief further notes that Ms. Young eventually was prosecuted in federal court for "bilking" Mr. and Mrs. Santa Barbara out of tens of thousands of dollars.

**First Charge: Robert S. Sencindiver**

On February 8, 2005, Robert S. Sencindiver signed a retainer agreement in Mr. Santa Barbara's office for representation in a personal injury suit regarding an incident that occurred on November 20, 2004.[4] Mr. Sencindiver said that he believed Mr. Santa Barbara was handling his case and would pursue his claim. Mr. Sencindiver called Mr. Santa Barbara's office four or five months after signing the retainer agreement, at which time he was advised by an office assistant/secretary that his medical bills were submitted to the insurance company involved. Mr. Sencindiver also testified that he contacted Mr. Santa Barbara's office on several occasions, but Mr. Santa Barbara was never available to speak with him.

Mr. Santa Barbara confirmed Mr. Sencindiver's presence in his office on February 8, 2005. However, he maintained that a question arose during that meeting about whether Mr. Sencindiver was in the employ of the business where the incident occurred, making it unclear whether the case involved a "deliberate intent" claim or a simple "slip-and-fall" personal injury claim. Mr. Santa Barbara noted that Mr. Sencindiver failed to submit the additional information Mr. Santa Barbara requested at the meeting related to the nature of the claim. Mr. Santa Barbara said the next contact Mr. Sencindiver had with the office was on January 31, 2007, but Mr. Santa Barbara was unable to reach Mr. Sencindiver when he returned the call. Mr. Santa Barbara related that Mr. Sencindiver called again on March 7, 2007, inquiring about the status of his claim. This phone call started the search by office staff for the client file. The file was not located until May 11, 2007, at which time Mr. Santa Barbara wrote a letter to Mr. Sencindiver advising him that a "slip-and-fall" accident is generally governed by a two year statute of limita-

tions and that no claim had been filed within two years of the injury. He further noted in the letter that while he did not believe that Mr. Sencindiver had a sustainable cause of action, he "invited" Mr. Sencindiver to discuss the matter with another attorney.

In a sworn statement on December 19, 2008, Mr. Santa Barbara stated it was not his intention to represent Mr. Sencindiver in the personal injury matter. Additionally, Mr. Santa Barbara testified that despite the contents of the located client file, he did not recall giving Mr. Sencindiver the retainer agreement, nor did he recall giving Mr. Sencindiver the authorization to obtain medical files.

The HPS determined that the existence and contents of the office file demonstrated that an attorney-client relationship was created as of February 8, 2005. Whether the retainer agreement was signed in Mr. Santa Barbara's presence or in the presence of a staff member was irrelevant to the establishment of an attorney-client relationship because it was done with the knowledge and authorization of his law office. As a result the HPS found that Mr. Sencindiver's complaint represented a violation of Rule 1.3,[5] because Mr. Santa Barbara did not act with reasonable diligence by allowing the statute of limitations to expire. Additionally, the HPS determined that Rules 1.4(a) and 1.4(b)[6] were also violated by Mr. Santa Barbara as he repeatedly failed to communicate with his client.

**Second Charge: Tommy D. Burris**

In late January or early February 2004, Tommy D. Burris hired Mr. Santa Barbara to file a claim for injuries resulting from a January 14, 2004, head-on collision with a drunk driver. His mother was a former client of Mr. Santa Barbara. Both Mr. Burris and his mother communicated with Mr.

---

4. It was never clearly established if Mr. Santa Barbara or an assistant/secretary was in the office when Mr. Sencindiver affixed his signature to the retainer agreement.

5. Rule 1.3 provides: "A lawyer shall act with reasonable diligence and promptness in representing a client."

6. The relevant portions of Rule 1.4 provide:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

348

Santa Barbara and his office about Mr. Burris's case. After a period of time, Mr. Santa Barbara stopped returning phone calls concerning the status of the case. Around January 30, 2007, after his mother had contacted the insurance company about the matter, Mr. Burris called Mr. Santa Barbara and learned that the two year statute of limitations applicable to his suit had expired.

Mr. Santa Barbara admitted that he missed the statute of limitations and that he made the mistake because he had entered the wrong date of the accident into what he then was using as a tickler system. He entered the date of the accident as a year later than when it occurred. He did not discover the error until January 2007 when Mr. Burris inquired about his case. Mr. Santa Barbara admitted that he failed to look at the numerous handwritten notes and correspondence in the client's file which indicated the correct date of the incident, relying solely instead on the date he erroneously entered into his tickler file.

The HPS decided that the evidence presented regarding the Burris complaint established that Mr. Santa Barbara violated Rule 1.3 by missing the filing deadline on the claim. The HPS also determined that Mr. Santa Barbara violated Rule 1.4(a), by failing to return phone calls and neglecting to keep Mr. Burris informed of the status of the case, as well as Rule 1.4(b), for not explaining the matter to Mr. Burris in a manner reasonably necessary to permit the client to make informed decisions about the representation.[7]

### Third Charge: Complaints of Christa B. Clark and Jennifer L. Milanowski

On April 9, 2005, Christa B. Clark and Jennifer L. Milanowski each retained Mr. Santa Barbara by separate contingent fee agreements to represent them in their related personal injury suits. Both women received on-the-job injuries on March 10, 2005, while employed by a company which subcontracted its services to the Federal Emergency Management Agency (FEMA). Ms. Clark had fallen from a fire escape at the work place, and Ms. Milanowski sustained injury when she tried to render aid to her co-worker.

During the course of the representation, both of the women sent numerous emails and left phone messages for Mr. Santa Barbara from which they generally received no direct personal response. As the statute of limitations deadline on their claims drew nearer, both women made more frequent attempts to reach Mr. Santa Barbara. During one phone conversation with Mr. Santa Barbara's assistant/secretary on March 8, 2007, Mr. Santa Barbara was overheard in the background saying that the deadline for filing the suit was May 10, 2007. The women called back to the law office and informed the secretary that the correct deadline was March 10, 2007. Thereafter, Mr. Santa Barbara filed the lawsuits on March 10, 2007, although he did not inform the women of the occurrence. Significantly, because liability of a federal government agency was at issue, the suit was governed by the provisions of the Federal Tort Claims Act (hereinafter "FTCA"). Mr. Santa Barbara admitted that he had not researched the FTCA and was unaware of the requisite six-month pre-suit notification requirement governing these suits. As a result, the women's claims were lost.

Frustrated with their failed attempts to communicate with Mr. Santa Barbara, Ms. Clark and Ms. Milanowski physically went to his office on April 14, 2008, to try to set up a meeting. On April 15, 2008, Mr. Santa Barbara met with the women and told them he had incorrectly handled their cases and the problem could not be fixed. The women then retained new counsel to pursue malpractice claims against Mr. Santa Barbara.

As a consequence of Ms. Clark's and Ms Milanowski's complaints, the HPS found that Mr. Santa Barbara violated Rule 1.1[8] by

---

7. Although the ODC proposed that Mr. Santa Barbara's conduct in defending the Burris charge also represented a violation of Rule 8.1(a), the Board did not find there was clear and convincing evidence showing that Mr. Santa Barbara knowingly made a false statement of material fact in connection with the disciplinary matter.

8. Rule 1.1 is entitled **"Competence"** and states in its entirety:
 A lawyer shall provide competent representation to a client. Competent representation

failing to familiarize himself with the requirements set forth for filing FTCA cases and in so doing failed to perfect the jurisdictional notice requirements prior to filing their suits. The Board also found Mr. Santa Barbara violated Rule 1.3 by failing to diligently pursue Ms. Clark's and Ms. Milanowski's lawsuits. For his failure to return phone calls, to keep the clients informed of the status of their cases, or to provide adequate explanations which would allow them to make informed decisions about the representation, the HPS further found that Mr. Santa Barbara violated Rules 1.4(a) and 1.4(b).

### Fourth Charge: Office of Disciplinary Counsel Complaint regarding Karen Thomas

While operating as the Law Office of Michael Santa Barbara, Mr. Santa Barbara represented Karen Thomas in a slip-and-fall case against Wal-mart that resulted in a $50,000 settlement in August 2002. Mr. Santa Barbara withheld $15,000 of the settlement[9] and placed it in an IOLTA account of his solo practice firm. When Mr. and Mrs. Santa Barbara formed the Santa Barbara Law Offices in January 2003, the funds Mr. Santa Barbara retained from the Thomas settlement were not transferred into the bank accounts of the new firm. The location of the money at that point in time was not established, however, it was revealed during the disciplinary proceedings that the funds remaining in the former firm's IOLTA account were insufficient to satisfy the monies due Mrs. Thomas.

Mr. Santa Barbara readily admitted that he has always disliked the administrative duties attendant to a law office since he began practicing law in 1991. When he worked for law firms, Mr. Santa Barbara relied on the firm's partners to decide how administration and management activities should be handled. Both in his solo practice and the practice with his wife, he was forced to become more involved in these activities, although still relying primarily on his assistant/secretary to perform office management and bookkeeping functions, including handling the firm's IOLTA and other bank accounts. Penny Young was the legal assistant/secretary who handled Mr. Santa Barbara's IOLTA accounts after the formation of the Santa Barbara Law Offices in 2003.

At some point in 2003, Mrs. Thomas contacted Mr. Santa Barbara concerning the status of the IOLTA account monies withheld to pay a potential Medicaid lien; Mr. Santa Barbara did not respond to the inquiry. There was no communication between the parties until Mrs. Thomas contacted Mr. Santa Barbara in August 2007 in need of funds. Mr. Santa Barbara checked the IOLTA account and discovered insufficient funds to pay the money owed Mrs. Thomas, but he could provide no explanation as to what happened to the money. Testimony taken during the disciplinary proceedings indicates that Mr. Santa Barbara's assistant/secretary, Ms. Young, may have been involved. Ms. Young was later fired from her job at the law firm after Mr. Santa Barbara discovered that she had defrauded the firm out of tens of thousands of dollars.[10] After her termination, Mr. Santa Barbara discovered a number of items missing from the office including several files, the IOLTA account records, and other business records. Mr. Santa Barbara later transferred money from the Santa Barbara Law Office account into the IOLTA account to be able to make partial payment of the outstanding amount due Ms. Thomas. After this was done, Mr. Santa Barbara still owed Mrs. Thomas $4,000, which he eventually satisfied in September 2009.

The HPS concluded[11] that the facts underlying the ODC complaint constitutes a viola-

requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

9. Funds were apparently withheld for different reasons, which included payment of a potential Medicaid lien.

10. It was established that Ms. Young was later convicted of federal crimes related to her fraudulent activity at the firm.

11. The HPS had determined as a result of the hearing that Mr. Santa Barbara's conduct did not represent violations of Rules 8.4(b) and (c) as suggested by the ODC. The HPS specifically noted that the evidence did not clearly and convinc-

tion Rule 1.15(a)[12] for Mr. Santa Barbara's failure to properly oversee and manage the trust account of a client. As a result of the misconduct outlined above and after considering mitigating[13] and aggravating[14] factors, the HPS recommends that Mr. Santa Barbara's license be suspended for a year;[15] that Mr. Santa Barbara undergo psychological and/or psychiatric counseling to address his depression and alcohol abuse issues, and that such counseling continue until such time that it is determined and certified by the treating therapist that counseling is no longer needed; that Mr. Santa Barbara should complete at least eight hours of continuing legal education within the next twenty-four months on the subjects of office management and office practice; that upon reinstatement Mr. Santa Barbara's office management and office practice methods be supervised by another licensed lawyer for one year; that Mr. Santa Barbara make restitution to the Board for all costs incurred in the prosecution of these proceedings.

## II. Standard of Review

■ We review lawyer disciplinary cases according to the following standard set forth in syllabus point three of *Committee on*

*Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994):

A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar [currently, the Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

■ This standard is consistent with the authority vested in this Court with regard to the ultimate disposition of legal ethics matters in this State. "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984).

---

ingly establish such violation because there was no indication that Mr. Santa Barbara intended to commit a criminal act or engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

12. Rule 1.15(a) provides as follows regarding the safekeeping of property:

A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account designated as a "client's trust account" in an institution whose accounts are federally insured and maintained in the state where the lawyer's office is situated, or in a separate account elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

13. The mitigating factors expressly recognized by the HPS are: an absence of prior disciplinary record, absence of a dishonest motive, inexperience in the practice of law to the extent of office management skills and handling of accounts, the

otherwise good character of Mr. Santa Barbara, the existence of severe depression and alcohol impairment with substantial marital discord and the mental distress created by the misconduct of his assistant/secretary, and expression of remorse with respect to each of the complainants other than Mr. Sencindiver.

14. The aggravating factors the HPS identified included that: Mr. Santa Barbara's lack of diligence and failure to communicate with his clients were repeated offenses occurring over a substantial period of time; that Mr. Santa Barbara's failure to acknowledge that an attorney-client relationship existed between him and Mr. Sencindiver was unwarranted and wholly inappropriate under the totality of the circumstances in that complaint; and that there was an unreasonable delay in making full restitution to Mrs. Thomas regardless of the reason for the shortage in the IOLTA account.

15. The HPS determined that the general rule of disbarment as the sanction for misappropriation or conversion of entrusted funds was not warranted in this case because there was no apparent intent to misappropriate or convert the funds of Mrs. Thomas held in trust by Mr. Santa Barbara.

## III. Discussion

The ODC urges this Court to accept the recommendations of the HPS, arguing that the evidence in the case establishes that Mr. Santa Barbara violated duties to clients, the public, the legal system and to fellow members of the legal profession. In the proceeding before us, Mr. Santa Barbara does not largely contest the HPS factual findings and conclusions upon which the violations are based. Rather, his primary objection is how the HPS treats these factual findings as aggravating or mitigating circumstances in arriving at a recommended sanction. Mr. Santa Barbara maintains that the recommended sanction of a one-year suspension of his law license fails to give proper weight to the evidence surrounding the mitigating element of his significant depression. He asserts that the recommendation shows a failure of the HPS to appreciate the "synergistic effect" between the disruption caused by the assistant/secretary he ultimately fired, his depression, and his ability to defend the charges.

■ The Board determined that Mr. Santa Barbara's conduct relative to the complaints at issue constitutes violations of Rules 1.1, 1.3, 1.4, and 1.15. Because the factual findings and conclusions underlying the violations are subject to substantial deference, "[t]he burden is on the attorney at law to show that the factual findings are not supported by reliable, probative, and substantial evidence on the whole adjudicatory record made before the [subcommittee panel of the Board]." *McCorkle*, 192 W.Va. at 290, 452 S.E.2d at 381. Mr. Santa Barbara has not raised any meaningful objection here as to particular findings or conclusions upon which the violations are based. While Mr. Santa Barbara continues to contest the Board's conclusion that an attorney-client relationship existed with Mr. Sencindiver, Mr. Santa Barbara does so without demonstration of how the record does not support this conclusion. Our independent review of the record discloses no reason to disturb this or any of the factual findings and conclusions of the Board since these determinations are supported by substantial evidence on the record as a whole. *McCorkle*, Syl. Pt. 3. Having determined we agree with the HPS findings that Mr. Santa Barbara's conduct constitutes violations of Rules 1.1, 1.3, 1.4(a) and (b) and 1.15(a), we consider the appropriate sanctions for the misconduct.

In arguing against suspension, Mr. Santa Barbara contends that much of his behavior during the periods of the complaints was influenced by his debilitating depression resulting in part from the disturbance caused by an employee. He maintains that his depression should be considered a mitigating factor which warrants a less severe sanction than suspension of his license to practice law. Mr. Santa Barbara proposes that the more appropriate sanction is a public reprimand with payment of all costs of the proceedings, followed by a period of supervised practice for a period of one year. The ODC argues that Mr. Santa Barbara's depression received proper consideration under the circumstances and that the suspension recommended by the Board is justified in this case.

■ The existence of mental health problems is not a complete defense to disciplinary charges; however, in appropriate circumstances a mental disability may be considered as a mitigating factor in determining an appropriate sanction. Syl. Pt. 2, *Committee on Legal Ethics*, 178 W.Va. 150, 358 S.E.2d 234 (1987). In syllabus point three of *Lawyer Disciplinary Board v. Dues*, 218 W.Va. 104, 624 S.E.2d 125 (2005), this Court defined under what circumstances mental health issues are viewed as mitigating:

> In a lawyer disciplinary proceeding, a mental disability is considered mitigating when: (1) there is medical evidence that the attorney is affected by a mental disability; (2) the mental disability caused the misconduct; (3) the attorney's recovery from the mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

The record reflects that Mr. Santa Barbara presented extensive medical evidence that he suffered from a mental disability or impairment, including the expert testimony of a psychologist, Dr. Bernard J. Lewis. It also reveals that Mr. Santa Barbara was

suffering from the mental disability of depression during the time period of the allegations in the Statement of Charges. The record, however, does not contain medical evidence indicating that Mr. Santa Barbara has recovered from his mental disability due to a meaningful and sustained period of successful rehabilitation, or that any steps taken by Mr. Santa Barbara toward rehabilitation are adequate to assure that recurrent misconduct is unlikely.

It is undisputed that Mr. Santa Barbara has suffered from recurring periods of depression both before and after his admission to the practice of law. He has received varying types of treatment for his depression at different times in his life. He was diagnosed by his family doctor as having depression in November 2003, for which he received prescription medication. Dr. Lewis, Mr. Santa Barbara's expert who is a practicing clinical and forensic psychologist, treated Mr. Santa Barbara in 2008. While Mr. Santa Barbara had sought treatment from Dr. Lewis, he made limited use of the doctor's services as he only made it to three appointments before cancelling and not rescheduling future therapy sessions. He admittedly made the unilateral decision to treat his problem by selectively using the medications he has received from his family doctor. At the hearing of the HPS, Dr. Lewis opined that even though Mr. Santa Barbara was not then manifesting signs of moderate or severe depression he believed Mr. Santa Barbara should be involved in counseling or therapy on an ongoing basis to assist him in recognizing the onset of symptoms of severe depression in the future while continuing to use the medications prescribed by his family doctor to treat the emotional condition. Dr. Lewis also expressed concern about the impact of alcohol on Mr. Santa Barbara's emotional condition while using medications to combat the depression. It also appears from the record that Mr. Santa Barbara has not followed the additional advice of Dr. Lewis to have his prescriptive medications reviewed by a psychiatrist.

 Although Mr. Santa Barbara failed to present adequate evidence reflecting he has attained meaningful recovery or that the rehabilitative measures he has undertaken are adequate to assure that recurrent misconduct is unlikely, the HPS expressly considered his condition as a mitigating factor under the circumstances. In other words, the HPS would have likely recommended a longer period of suspension as the appropriate sanction for the misconduct had Mr. Santa Barbara's emotional state and the circumstances contributing to that state had not been present. This approach represents a fair assessment and an appropriate balancing of interests involved in determining the proper sanction in a disciplinary hearing. As set forth in syllabus point three of *Committee on Legal Ethics v. Walker*,

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

178 W.Va. at 150, 358 S.E.2d at 234. In consideration of these factors, this Court adopts the discipline recommended by the HPS as the appropriate punishment for Mr. Santa Barbara's professional transgressions, as it adequately serves to deter like conduct by other lawyers, to restore public confidence in the legal profession and to protect the public.

## IV. Conclusion

For the foregoing reasons, the recommended sanctions contained in the November 28, 2011, Recommended Decision of the HPS are adopted, imposing the following discipline on Mr. Santa Barbara as respondent to this proceeding:

(1) That respondent be suspended from the practice of law for a period of one year;

(2) That during the period of suspension respondent commence and continue to undergo psychological and/or psychiatric counseling to deal with depression and alcohol abuse issues until such time that it is determined by the treat-

ing psychologist or psychiatrist that treatment is no longer necessary. The treating counselor shall submit progress reports to the ODC every six months;

(3) That respondent complete eight hours of continuing legal education in office management and office practice within the next twenty-four months with satisfactory proof of completion provided to the ODC;

(4) That, upon reinstatement, respondent's practice be supervised for one year; and

(6) That respondent reimburse the Board for the costs incurred in this proceeding pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

Law license suspended and other sanctions imposed.